IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

BETH A. HAHN,                                )        CASE NO. 5:13-cv-02354
                                             )
                        Plaintiff,           )        MAGISTRATE JUDGE
                                             )        KATHLEEN B. BURKE
            v.                               )
                                             )
COMMISSIONER OF SOCIAL                       )
SECURITY ADMINISTRATION,                     )
                                             )        **MEMORANDUM OPINION & ORDER**
                        Defendant.           )

Plaintiff Beth A. Hahn ("Plaintiff" or "Hahn") seeks judicial review of the final decision

of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying her

applications for social security disability benefits.  Doc. 1.  This Court has jurisdiction pursuant

to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the

consent of the parties. Doc. 14.   The Court **AFFIRMS** the Commissioner's decision.

### I.  Procedural History

Hahn protectively filed applications for Disability Insurance Benefits ("DIB") and

Supplemental Security Income ("SSI") on May 27, 2010.[1]  Tr. 16, 169-179, 191, 227, 237.  She

alleged a disability onset date of December 31, 2002.  Tr. 16, 169, 176.  She claimed disability

due to hypertension, bipolar disorder, a heart attack in 2008, scoliosis, epilepsy, depression, high

cholesterol, carpal tunnel, anxiety, low thyroid, bronchitis, and arthritis.  Tr. 84, 101, 195, 229.

After initial denial by the state agency (Tr. 84-97), and denial upon reconsideration (Tr. 101-

---

[1]The Social Security Administration explains that "protective filing date" is "The date you first contact us about
filing for benefits. It may be used to establish an earlier application date than when we receive your signed
application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 1/9/2015).

114), Hahn requested a hearing (Tr. 115-116).  On April 16, 2012, Administrative Law Judge

Paula J. Goodrich ("ALJ") conducted an administrative hearing.  Tr. 39-75.

In her May 11, 2012, decision (Tr. 13-38), the ALJ determined that Hahn had not been

under a disability from December 31, 2002, through the date of the decision.  Tr. 16, 33.  Hahn

requested review of the ALJ's decision by the Appeals Council.  Tr. 12.  On August 30, 2013,

the Appeals Council denied Hahn's request for review, making the ALJ's decision the final

decision of the Commissioner.  Tr. 1-6.

## II. Evidence

### A.  Personal, educational and vocational evidence

Hahn was born in 1966.  Tr. 43-44, 169, 176.  At the time of the hearing, Hahn was

separated from her husband and she was residing in her parents' house.  Tr. 44, 51.  She

completed the 12th grade.  Tr. 45, 196.  She last worked in 2002 when she was working as a

contractor in a security type position in a parking lot for Goodyear.  Tr. 45-46, 51, 195.  Her

position was partially a desk job.  Tr. 48-50.  She issued permits for cars to park in the parking

lot and was responsible for making sure that the cars in the lot had the proper permits and she

was responsible for cleaning up trash in the parking lot. Tr. 47-49.  She supervised employees.

Tr. 48.  She left that position because Goodyear started cutting back on their contractors.  Tr. 50-

51.

### B.  Medical evidence

#### 1.  Mental impairments

##### a.  Treatment history

Following incarceration and treatment through a drug rehabilitation facility, Hahn began

receiving mental health treatment through the Community Health Center.  Tr. 437.  She self-

referred herself for mental health treatment and was placed on Intervention in Lieu of Conviction.  Tr. 438.  She started treatment with psychologist Nancy Jones Keogh, Ph.D., beginning in July 2009 and, Dr. Keogh referred Hahn to psychiatrist B. Verma, M.D., in August 2009 for evaluation.[2]  Tr. 497-504.  At that time, Hahn had recently stopped using cocaine.  Tr. 498, 502.  Dr. Verma's mental status findings included findings that Hahn was withdrawn, preoccupied, agitated, depressed, anxious, labile, impulsive, and Dr. Verma noted that Hahn's attention/concentration was impaired, her speech was rapid and she had racing thoughts and flight of ideas. Tr. 498-499, 502-503.  Dr. Verma diagnosed Hahn with bipolar disorder, mixed type (with cocaine dependence) and assessed a GAF score of 40-45.[3]  Tr. 499, 503.

Hahn continued treating with Dr. Verma and Dr. Keogh through 2011.[4]  Tr. 458-504, 642, 645, 652, 655, 662-664, 673, 680-681, 684-708.  At the start of treatment in 2009, Hahn complained of depression, crying spells, anxiety and sleeping problems.  Tr. 493.  However, Hahn's treatment notes during 2009 through 2011 generally show that she was showing signs of improvement.  Tr. 458, 460, 462, 464, 466, 468, 470, 472, 474, 476, 478, 480, 482, 485, 487, 489, 491, 493, 495, 680, 684, 686, 688, 690, 692, 694, 696, 699, 701, 703, 705, 707.  During a January 31, 2011, session with Dr. Keogh, Hahn did report being concerned about her mental

---

[2] The record reflects evaluations on August 3, 2009, and August 26, 2009.  Tr. 497, 501.

[3] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 31 and 40 indicates "some impairment in reality testing or communication (e.g., speech at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." *Id.*  A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)." *Id.*

[4] Some therapy sessions were conducted via videoconferencing because it was difficult for Hahn to get to appointments due to her foot surgery.  Tr. 655, 662, 664. The possibility of using videoconferencing was also discussed for periods when Hahn's parents were not available to drive her to therapy.  Tr. 681.

status because of her many physical problems.  Tr.  673.  However, later in 2011, during an August 2011, session with Dr. Keogh, Hahn and Dr. Keogh discussed Hahn's interest in trying to pay her fines and get her driver's license back and the possibility of pursuing a part-time job or volunteer work.  Tr. 652.  Hahn also noted that she would get more active and would explore meaningful activities like online computer courses.  Tr. 652.  Hahn also relayed to Dr. Keogh the fact that her mother felt she was depressed because she was lying around all day but Hahn indicated that she was trying to stay off of her foot so that it would heal.  Tr. 652.

Hahn also attended counseling sessions with Rebekah Watkins, BA, M.Ed., CDCA PC, PCC.  Tr. 643-644, 646-651, 653-654, 656-661, 665-672, 674-679, 682.  During counseling sessions with Ms. Watkins, Hahn's GAF scores ranged from 49 (Tr. 660) to 58 (Tr. 678), with most scores falling in the mid-50s range.  Tr. 643, 646, 648, 650, 653, 656, 658, 660, 665, 667, 669, 671, 674, 676, 678.

### b.  Opinion evidence

*Treating sources*

Both Dr. Verma and Dr. Keogh provided opinions regarding Hahn's mental health impairments.  Tr. 352, 353, 711-717. On May 10, 2010, Dr. Verma and Dr. Keogh each completed a Functional Capacity Questionnaire (Mental) offering similar opinions.  Tr. 352, 353.

Dr. Verma's diagnoses included bipolar disorder, mixed type.  Tr. 352.  She assessed Hahn's current GAF score as 40 to 45.  Tr. 352.  Dr. Verma identified Hahn's signs and symptoms as: pervasive loss of interest in almost all activities; feelings of guilt or worthlessness; generalized persistent anxiety; difficulty thinking or concentrating; mood disturbance; and bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes.  Tr. 352.  She opined that Hahn's psychiatric problems

could exacerbate her physical or psychological pain, suffering, insomnia, etc.  Tr. 352.  She

opined that Hahn's impairments or treatment would cause her to be absent more than 4 days per

month.  Tr. 352.  With respect to Hahn's functional limitations, Dr. Verma opined that Hahn had

marked impairments in activities of daily living and in maintaining social functioning and she

had moderate impairments in maintaining concentration, persistence or pace and in episodes of

decompensation.  Tr. 352.

Dr. Keogh diagnosed Hahn with bipolar disorder.  Tr. 353.  She assessed Hahn with a

current GAF score of 40.  Tr. 353.  Dr. Keogh identified the same signs and symptoms as noted

in Dr. Verma's opinion and Dr. Keogh also identified as a sign or symptom emotional

withdrawal or isolation.  Tr. 353.  She opined that Hahn's impairments or treatment would cause

her to be absent more than 4 days per month.  Tr. 353.  With respect to Hahn's functional

limitations, Dr. Keogh opined that Hahn had marked impairments in activities of daily living, in

maintaining social functioning, and in maintaining concentration, persistence or pace; and

moderate impairment in episodes of decompensation.  Tr. 353.

Also, on January 31, 2011, Dr. Keogh completed a Medical Source Statement

Concerning the Nature and Severity of the Individual's Mental Impairment ("MSS").  Tr. 604-

610, 711-717.[5]  In the MSS, Dr. Keogh's diagnoses included bipolar I disorder, mixed, and

cocaine dependence.[6]  Tr. 711.  She assessed Hahn with a current GAF of 55[7] and indicated that

---

[5] Dr. Keogh's January 31, 2011, MSS appears in the record as two separate Exhibits – Exhibit 22F (Tr. 604-610) and Exhibit 27F (Tr. 711-717).  The Court will refer to record found at Tr. 711-717.

[6] In response to a question regarding whether Hahn's substance abuse contributed to her limitations as found by Dr. Keogh, Dr. Keogh indicated that it did not and noted that Hahn had been abstinent for 15 months.  Tr. 716.

[7] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  DSM-IV-TR, at 34.

Hahn's highest GAF in the past year was 65.[8]  Tr. 711.  Dr. Keogh indicated that Hahn was

managing her chronic bipolar symptoms with medication and behavioral management as well as

her recovery from substance abuse.  Tr. 711.  Dr. Keogh opined that Hahn's prognosis was fair

for the chronic condition of bipolar disorder.  Tr. 711.  Dr. Keogh included a list of Hahn's

prescribed medications and indicated that side effects included fatigue and drowsiness.  Tr. 711,

717.  She indicated that Hahn's depressive symptoms included low energy, low motivation, and

hypersomnia.  Tr. 711.  Dr. Keogh noted that Hahn had stated that, when she was not on

medication, she slept all day.  Tr. 711.  Dr. Keogh also noted Hahn's manic symptoms which

included euphoria, decreased need for sleep, and a spending spree that resulted in foreclosure and

bankruptcy.  Tr. 711.  Dr. Keogh also listed other signs and symptoms, including anhedonia or

pervasive loss of interest in almost all activities; generalized persistent anxiety; emotional

withdrawal or isolation; and flight of ideas.  Tr. 712.

 Also, in the MSS, Dr. Keogh rated Hahn's work-related abilities in 25 categories.[9]  Tr.

713-714.  There was no category in which Dr. Keogh rated Hahn's ability as "unlimited or very

good."  Tr. 713-714.  Dr. Keogh rated Hahn's ability as "limited but satisfactory" in 10

categories –   (1) understand and remember very short and simple instructions; (2) carry out very

short and simple instructions; (3) ask simple questions or request assistance; (4) get along with

co-workers or peers without unduly distracting them or exhibiting behavioral extremes; (5) be

aware of normal hazards and take appropriate precautions; (6) interact appropriately with the

general public; (7) maintain socially appropriate behavior; (8) adhere to basic standards of

---

[8] A GAF score between 61 and 70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  DSM-IV-TR, at 34.

[9] The five available rating choices were: unlimited or very good; limited but satisfactory; seriously limited, but not precluded; unable to meet competitive standards; and no useful ability to function.  Tr. 713-714.

neatness and cleanliness; (9) travel in an unfamiliar place; and (10) use public transportation.  Tr. 713-714.   Dr. Keogh rated Hahn's ability as "seriously limited, but not precluded" in 1 category – make simple work-related decisions. Tr. 713.   Dr. Keogh rated Hahn's ability as "unable to meet competitive standards" in 12 categories –   (1) remember work-like procedures; (2) maintain attention for two hour segment; (3) maintain regular attendance and be punctual within customary, usually strict tolerances; (4) work in coordination with or proximity to others without being unduly distracted; (5) complete a normal workday and workweek with interruptions from psychologically based symptoms; (6) perform at a consistent pace without an unreasonable number and length of rest periods; (7) accept instructions and respond appropriately to criticism from supervisors; (8) respond appropriately to changes in a routine work setting; (9) understand and remember detailed instructions; (10) carry out detailed instructions; (11) set realistic goals or make plans independently of others; and (12) deal with stress of semiskilled and skilled work. Tr. 713-714.  Dr. Keogh rated Hahn as having "no useful ability to function" in 2 categories – (1) sustain an ordinary routine without special supervision; and (2) deal with normal work stress. Tr. 713.  In support of her ratings, Dr. Keogh stated "Bipolar disorder -  both depressive and manic sx – make it difficult to concentrate or to remember detailed instructions, set goals and are quite stressful."  Tr. 714.

Also, in the MSS, Dr. Keogh rated Hahn's functional limitations.[10]  Tr. 715.  Dr. Keogh opined that Hahn had "extreme" limitations in her activities of daily living; maintaining social functioning; and maintaining concentration, persistence or pace.  Tr. 715.  Dr. Keogh indicated that Hahn had experienced three episodes of decompensation within a 12 month period, each of at least two weeks duration.  Tr. 715.  She also indicated that Hahn had a current history of one or more years' inability to function outside a highly supportive living arrangements with an

---

[10] The four available rating choices were: none-mild; moderate; marked; and extreme.  Tr. 715.

indication of continued need for such an arrangement.  Tr. 715.  She reiterated her opinion from 2010 that, because of her impairments or treatment, Hahn would be absent from work more than 4 days per month.  Tr. 715.

*Consultative examining psychologist*

On August 31, 2010, psychologist Robert F. Dallara, Jr., Ph.D., conducted a psychological evaluation.  Tr. 514-517.  Dr. Dallara diagnosed Hahn with mood disorder, NOS; cocaine dependence in self-reported remission; anxiety disorder, NOS.[11]  Tr. 516.  He assessed a GAF score of 62.  Tr. 517.  With respect to her work related mental abilities, Dr. Dallara opined that: (1) Hahn's ability to relate to others, including fellow workers and supervisors, appeared to be mildly impaired due to her mood and anxiety difficulties noting that Hahn was generally able to relate adequately to him during the examination; (2) Hahn's ability to understand, remember, and follow instructions did not appear impaired noting that Hahn did not demonstrate significant difficulties with comprehension or memory during the examination; (3) Hahn's ability to maintain attention and concentration did not appear impaired during the examination and there was no direct evidence during the examination to suggest impairment with respect to her persistence or pace; and (4) Hahn's ability to withstand stress and pressure associated with day-to-day work activity appeared to be mildly impaired as a result of her mood and anxiety difficulties.  Tr. 517.

*State agency reviewing psychologists*

On September 27, 2010, state agency reviewing psychologist Karen Steiger, Ph.D., completed a Psychiatric Review Technique (Tr. 530-543) and Mental RFC Assessment (Tr. 526-529).  In the Psychiatric Review Technique, Dr. Steiger reviewed Hahn's mental health

---

[11] Dr. Dallara indicated that there was a possibility that Hahn suffered from bipolar disorder but there was insufficient evidence for such a diagnosis.  Tr. 516.

impairments in relation to the Listings but found that no Listing was met.  Tr. 530-543.  In rating

the "B" criteria, Dr. Steiger opined that Hahn had mild restrictions/difficulties in activities of

daily living and in maintaining social functioning and moderate difficulties in maintaining

concentration, persistence, or pace.  Tr. 540.  Hahn had no episodes of decompensation.  Tr. 540.

In the Mental RFC Assessment, Dr. Steiger rated Hahn's functional abilities in 20

categories.[12]  Tr. 526-527.  Dr. Steiger rated Hahn moderately limited in 1 category – ability to

complete a normal workday or workweek without interruptions from psychologically based

symptoms and to perform at a consistent pace without an unreasonable number and length of rest

periods.  Tr. 527.  In 12 categories, Dr. Steiger rated Hahn as not significantly limited.  Tr. 526-

527.  In the remaining 7 categories, Dr. Steiger found no evidence of limitation.  Tr. 526-527.

Based upon her review of the records, Dr. Steiger indicated that Hahn's allegations of bipolar

disorder, anxiety and depression were generally supported.  Tr. 528.  Dr. Steiger gave great

weight to Dr. Dallara's opinion as it was the most current and complete evaluation.  Tr. 528.

However, Dr. Steiger concluded that the medical evidence supported a finding of moderate,

rather than mild, as opined by Dr. Dallara, limitations in Hahn's ability to tolerate stressors.  Tr.

528.  She opined that Hahn appeared "capable of learning[,] remembering and performing work

tasks, relating to others and concentrating in settings that do not feature stressors such as high

production demands or rapidly changing work routine."  Tr. 528.

On reconsideration, on December 23, 2010, psychologist Irma Johnston, Psy.D.,

reviewed the medical evidence and affirmed Dr. Steiger's September 27, 2010, assessment as

written.  Tr. 579.

---

[12] The five available rating choices were: not significantly limited; moderately limited; markedly limited; no evidence of limitation; and not ratable on available evidence.  Tr. 526-527.

### 2.  Physical impairments

#### a.  Treatment history

Hahn was treated for a number of physical impairments.  On May 7, 2008, Hahn was admitted to the hospital with left-sided chest pain radiating into her left arm.  Tr. 333-334, 337-338.  She was discharged on May 9, 2008, following a left heart catheterization with stent placement.  Tr. 311-312, 422-426.  In July 2009, Hahn was seen for complaints of intermittent chest pain along with abdominal pain.  Tr. 284, 373.  On follow up, she was assessed with coronary atherosclerosis of native vessel and treated with medication.  Tr. 373.  In May, 2010, an echocardiogram stress test was performed due to chest pain.  Tr. 421.  Hahn's echocardiogram was abnormal and, upon referral by her physician Dr. Sarah A. Adams, M.D., on July 27, 2010, Hahn saw Dr. Cynthia M. Pordon, D.O., for a cardiology consultation.  Tr. 412-416.  Dr. Pordon provided some recommendations, including quitting smoking, obtaining a repeat echocardiogram to evaluate the severity of her mitral regurgitation as shown on the echocardiogram, and seeing Dr. Pordon for reevaluation in six months, or sooner as necessary.  Tr. 413.

Hahn has reported a history of severe arthritis in her feet and ankles since she was 30 years old.  Tr. 506.  On November 3, 2010, Hahn saw orthopedic surgeon Dr. Jeffrey Junko, M.D., for a consultation regarding right foot pain.  Tr. 586-587.  On physical examination, the overall alignment of Hahn's foot was normal; there was a slight bunion deformity; there were no signs of ecchymosis or swelling; sensation was intact to light touch; strength testing showed 5/5 strength; ankle range of motion was normal without pain or crepitus; there was a slight decrease in subtablar motion compared to the left side; there was tenderness across the talonavicular, calcaneocuboid, and all joints of the midfoot; there was no pain to palpation in the forefront; and

there was normal range of motion of the toes.  Tr. 587.  X-rays taken in late 2009 showed extensive arthritis in certain areas and an MRI showed areas of arthropathy.  Tr. 587.  Based on his physical examination and review of prior x-rays and MRI, Dr. Junko's diagnosis was right talonavicular, calcaneocuboid, and midfoot arthritis.  Tr. 587.  Dr. Junko recommended that Hahn see a rheumatologist to see if there were medications that might improve her comfort level and he indicated he would see Hahn again in a couple months.  Tr. 587.

As recommended, Hahn saw rheumatologist Dr. Rachel Waldman, M.D., in November and December 2010.  Tr. 544-546, 576-578.  Dr. Waldman indicated that Hahn had arthritis in her right foot.  Tr. 576.  Dr. Waldman noted that she did not see a systemic cause for Hahn's symptoms but she would follow Hahn over time or if new symptoms emerged.  Tr. 576.

After seeing Dr. Waldman, on January 26, 2011, Hahn saw Dr. Junko for follow up.  Tr. 588-589.  An examination of Hahn's right ankle showed no signs of effusion; flexion was limited; there was moderate tenderness over the anterior lateral joint space but no other areas of tenderness were noted.  Tr. 589.  An examination of Hahn's right foot showed swelling and warmth over the midfoot; tenderness to palpation at the first, second, third, fourth and fifth tarsal metatarsal joints but no other areas of tenderness and no other areas of swelling were noted.  Tr. 589.  Hahn was observed walking with a limp.  Tr. 589.  Dr. Junko recommended injections in the right first and second tarsometatarsal joints and the talonavicular joint.  Tr. 588.

After receiving an injection in February 2011, on April 13, 2011, Hahn saw Dr. Junko.  Tr. 621-622.  Hahn reported that the injection had helped a little but her pain had returned.  Tr. 621.  Dr. Junko discussed the possibility of surgery.  Tr. 621.  Hahn decided to proceed with

surgery and, on April 28, 2011, Dr. Junko performed the surgery which involved fusion of the talonavicular joint and fusions of the second and third tarsometstarsal joints.[13]  Tr. 630-633.

Dr. Junko saw Hahn on May 11, 2011, for her first post-op visit.  Tr. 615.  Dr. Junko put a cast on and advised Hahn that she could not bear weight on her foot and would have to keep her foot elevated.  Tr. 615.  On May 25, 2011, Hahn saw Dr. Junko again.  Tr. 618.  He advised her that she would have to remain in the cast for two more weeks at which time he would see her again and get her into an air cast boot.  Tr. 618.  He also advised her that she could not bear weight on her foot for at least another four to six weeks. Tr. 618.  On June 8, 2011, Dr. Junko indicated that Hahn seemed to be doing well and her pain was well-controlled.  Tr. 612-613.  On examination, Hahn had very limited swelling in her hindfoot and midfoot.  Tr. 613.  Sensation was slightly decreased over the dorsum of the foot in the distribution of the superficial peroneal nerve.  Tr. 613.  She had mild tenderness over the talonavicular joint and over the second and third tarsometatarsal joints to palpation.  Tr. 613.  Dr. Junko moved Hahn into an air cast but advised her that she would have to continue not to bear weight on her right foot.[14]  Tr. 612.

### b.  Opinion evidence

*Treating source*

---

[13] Dr. Pordon saw Hahn on April 26, 2011, for a preoperative cardiology risk assessment prior to her orthopedic surgery.  Tr. 635-636.  Hahn reported doing relatively well from a cardiac standpoint.  Tr. 635.  Dr. Pordon noted, however, that Hahn had gained 7 pounds since January 2011, she was continuing to smoke at least a half a pack a day with no desire to quit, she was working with a counselor to help with her history of cocaine abuse but had last used cocaine 6 months ago, she denied chest pain but admitted to shortness of breath with walking, and she was not exercising because of her foot pain. Tr. 635. Following her evaluation and review of a stress echocardiogram, which was negative for ischemia at an adequate heart rate, Dr. Pordon indicated that Hahn was at low risk for her surgery. Tr. 634.

[14] It does not appear that there are additional surgical treatment notes beyond the post-op June 8, 2011, visit notes. However, Hahn's hearing testimony and mental health treatment notes reflect the fact that Hahn required subsequent surgeries on her foot.  Tr. 26, 51-54.

On February 1, 2011, prior to Hahn's April 28, 2011, foot surgery, Dr. Junko completed a Medical Source Statement.[15]  Tr. 720-724.  In that statement, Dr. Junko indicated that he had seen Hahn twice, first on November 3, 2010, and then on January 26, 2011.  Tr. 720.  Dr. Junko's diagnoses were right TMT joints 1-5, calcancocuboid, and talonavicular osteoarthrosis.  Tr. 720.  He opined that Hahn's prognosis was good.  Tr. 720.  Dr. Junko indicated that Hahn's symptoms were pain and swelling, noting that she had right foot and ankle pain on a daily basis and sometimes her pain was so bad that it kept her from getting out of bed.  Tr. 720.  He identified the following positive objective signs: reduced range of motion in her right ankle, joint warmth, swelling, and abnormal gait.  Tr. 720.  He opined that Hahn had the following functional limitations: unable to walk a city block without rest or severe pain; can sit for more than 2 hours at a time before needing to get up; can stand for 10 minutes at a time before needing to sit down or walk around; can sit for a total of 4 hours in a workday; can stand/walk for a total of less than 2 hours in a workday; needs to take unscheduled breaks during an 8 hour workday once an hour for about 10-15 minutes to lie down; with prolonged sitting, her leg(s) would need to be elevated above heart level for about 20% of the workday; requires use of a cane with occasional standing/walking; can frequently lift/carry 10 pounds or less, can occasionally lift/carry 20 pounds, and can never lift/carry 50 pounds; can occasionally twist or climb stairs; can rarely stoop (bend) or climb ladders; and can never crouch.  Tr. 723.  Dr. Junko also opined that, because of her impairments or treatment, Hahn would likely be absent from work more than 4 days per month.  Tr. 723.

Also, on November 29, 2011, Dr. Junko opined that Hahn was "currently disabled and . . . expected to be disabled for the next 12 months."  Tr. 710.  He also indicated that drug and alcohol

---

[15] The Medical Source Statement was titled "Medical Source Statement Concerning the Nature and Severity of an Individual's Arthritis."  Tr. 720.

abuse was not a contributing factor material to his disability determination stating that, absent drug or alcohol abuse, Hahn would still be limited from performing substantial gainful activity on a sustained basis. Tr. 710.

*Consultative examining physician*

On August 18, 2010, Dr. George E. Ilodi, D.O., examined Hahn. Tr. 506-512. An examination showed a slight decrease in Hahn's range of motion in her right ankle. Tr. 507. She could not touch her toes but she was able to get up and down from the examination table without too much difficulty. Tr. 507. Her gait was unsteady with heel-to-toe walk. Tr. 507. Otherwise, her gait was basically normal. T r. 507. Hahn reported needing to use a cane on uneven surfaces or for long distances and that she had fallen in the past when not using a cane. Tr. 507. Hahn reported that she could only stand for about 10-15 minutes; could only sit for 1-2 hours; and could only lift 10-20 pounds. Tr. 506-507.

> Dr. Ilodi opined that:
>
> Given the claimant's chief complaint in conjunction with my physical examination and the fact that she cannot walk without having discomfort at all times, can stand without discomfort for only 10-15 minutes, sit without discomfort 1-2 hours and lift only 10-20#, the claimant's work should be limited to sedentary work where she could lift no more than 10-20# and would not be permitted to stand more than 1-2 consecutive hours. Also, the claimant should have a cane or an assistive device with her while working as a [sic] I feel she is at moderate risk for falling without a cane.

Tr. 508.

*State agency reviewing physicians*

On September 12, 2010, state agency reviewing physician W. Jerry McCloud, M.D., having reviewed the record, completed a Physical RFC Assessment. Tr. 518-525. He opined that exertionally Hahn could occasionally lift/carry 20 pounds; frequently lift/carry 10 pounds; stand/walk at least 2 hours in an 8 hour workday; and sit about 6 hours in an 8 hour workday .

Tr. 519-520.  He opined that use of a hand-held assistive device was necessary for ambulation and Hahn was limited to occasional push/pull with lower extremities.  Tr. 519-520.  Dr. McCloud also opined that Hahn would be limited to occasional climbing of ramps/stairs, balancing, stooping, kneeling, crouching, and crawling and should never climb ladders/ropes/scaffolds (Tr. 520) and Hahn should avoid all exposure to hazards such as machinery and heights (Tr. 522).  He concluded that:

> The severity of the symptoms and its alleged effect on function is not consistent with the total medical and nonmedical evidence.  Claimant states she can only walk 5-10 minutes.  However, her gait was normal. Claimant states she can only stand/walk for 5-10 minutes.   CE MER shows that she is capable of standing/walking for about 2 hours in an 8 hour work day.   The claimant's statements are partially credible.

Tr. 523.

In offering his opinion, Dr. McCloud gave only partial weight to the statements of Dr. Ilodi explaining that "[t]here is no objective evidence that would suggest the claimant can only sit for 1-2 hours in a work day.  ROM/STR was normal in her back and pain is located in her right ankle."  Tr. 524.

On reconsideration, on February 24, 2011, state agency reviewing physician Leigh Thomas, M.D., affirmed Dr. McCloud's September 12, 2010, assessment as written.  Tr. 611.  Dr. Thomas reviewed new medical evidence, including Dr. Junko's February 1, 2011, functional opinion.  Tr. 611.  Dr. Thomas noted that Dr. Junko had opined that Hahn could stand less than 2 hours, sit for 4 hours, lift 20 pounds occasionally and lift 10 pounds frequently.  Tr. 611.  Dr. Thomas gave Dr. Junko's opinion only partial weight noting that there was no medical evidence to support a limitation in sitting.  Tr. 611.  Dr. Thomas noted that, during a telephone call, Hahn did not allege any additional symptoms and when contacted by telephone, Hahn was Christmas shopping (Tr. 235).  Tr. 611.

**C.** **Testimonial evidence**

**1.** **Plaintiff's testimony**

Hahn was represented and testified at the administrative hearing.  Tr.  42-67, 70.  When the ALJ asked Hahn why she felt that she was unable to work, Hahn indicated that she had arthritis and has undergone three surgeries on her right foot.  Tr. 51-54.  She estimated being on the couch at home about 80% of the time because, as a result of her foot surgeries, her foot swells up when she walks and she has to elevate it.  Tr. 51-55.  She was anticipating needing another surgery on her foot.  Tr. 51-55.  She does not do any recreational walking.  Tr. 55.  As a result of walking from the parking deck to the hearing and back, Hahn anticipated that her foot would be swollen and she would be required to put it up when she returned home.  Tr. 55.  When she needs to elevate her foot, she has to elevate it above her heart.  Tr. 62.  If she has not been walking too much or going out to an appointment, Hahn probably will not need to elevate her foot.  Tr. 62.  However, out of habit, if she is lying down at home watching television she tends to elevate her foot.  Tr. 62-63.  Hahn uses a cane if her foot is bothering her but she was not using a cane on the day of the hearing and indicated that she generally only uses her cane when her symptoms are aggravated.  Tr. 66.  She also reported having been prescribed a walker after her first surgery that had occurred in April 2011.  Tr. 67.  If she has to stand for any amount of time she uses her walker but, if she has a flare up and has to walk, she usually only uses her cane.  Tr. 67.

She indicated that her epilepsy also prevents her from working.  Tr. 51.  Hahn indicated that her most recent seizure was two weeks prior to the hearing.  Tr. 60.  Within the prior eight months, she had only one other seizure.  Tr. 60.  Before that, she had not had a seizure for about four to six months.  Tr. 61.  Because of her more recent seizures, she was going to be seeing her

doctor for a referral to a new neurologist.[16]  Tr.  60.  She was not sure whether her more recent

seizures were related to stress or her new combination of medications.  Tr. 60-61.

      She also indicated that she was unable to work because of mental problems, including

high anxiety, severe depression, and bipolar disorder.  Tr. 51.  She was seeing both a

psychologist and psychiatrist.  Tr. 51.

      The ALJ inquired as to whether Hahn had asthma.  Tr. 70.  Hahn responded that she gets

bronchitis once or twice each year.  Tr. 70.

      Hahn was not certain that she would be able to perform a job that required her to sit all

day because of her anxiety and tendency to become agitated.  Tr. 55.  She estimated being able to

sit comfortably for about 45 minutes before needing to stand up provided that she has not dozed

off because of her medications  Tr. 63.  She indicated that during the day she sometimes nods

off.  Tr. 63.  Also, she usually does not wake in the morning until around 10:00 a.m. and

sometimes not until noon.  Tr. 63.  Hahn indicated that she does not even get out of bed on

approximately 20 days during an average month.  Tr. 64-65.  The most she would do on those

days is get out of bed to go to the bathroom or to the kitchen to get something to eat.  Tr. 64.

Hahn is usually manic for about four to five days at a time and then depressed for about two

weeks.  Tr. 64.  She had just started a new medication, Seroquel, to help with her mood swings.

Tr. 65.  Because she had just started it, Hahn indicated it was too early to tell whether it was

helping but she hoped that it would.  Tr. 65.

      Hahn has a 13-year old daughter who lives with her father.  Tr. 56.  Hahn sees her

daughter at her parents' house but does not usually go places with her.  Tr. 56-57.  Hahn tries to

interact with her daughter.  Tr. 57.  For example, she plays games with her daughter as long as

---

[16] Hahn indicated that she was unable to see her old neurologist and instead had to see her primary care physician for a referral to a new neurologist.  Tr. 60.

she can do so without becoming agitated by others.  Tr. 58.  If her daughter is over, Hahn's mother takes care of cooking and doing laundry for Hahn's daughter.  Tr. 56.

Unless her daughter is over, a typical day for Hahn involves sitting on the couch.  Tr. 57.  Other than doing the dishes a couple of times, Hahn does not perform household chores.  Tr. 57.  Her parents take care of things.  Tr. 57.  She feels bad having to live with her parents and having them take care of her as opposed to her taking care of them.  Tr. 57.  Her dad usually fixes Hahn breakfast.  Tr. 58.  She is able to take care of her personal needs such as showering and doing her hair.  Tr.  58.  She has a chair in the shower if she needs to rest and she usually can get out of the bath herself if she takes a bath.[17]  Tr. 58.  She has a computer at home which is used primarily by her daughter but Hahn uses it to check her email.  Tr. 59.  She tends to watch television rather than read.  Tr. 59.  She used to read books but now she tends to lose interest in books.  Tr. 59-60.  When she watches the television, she can watch and follow shows that are a half-hour to an hour but really cannot stick with a two or three hour movie.  Tr. 65-66.

Hahn no longer has a driver's license.  Tr. 44-45.  She had some trouble in the past and also is an epileptic.  Tr. 44-45.  Her parents have a car and her mother drives her where she needs to go.  Tr. 45.  She has a handicap sticker for the car.  Tr. 45.  On occasion, she will go out to dinner with her parents and daughter.  Tr. 58.  She has attended AA/NA meetings for substance abuse, noting that her problem was cocaine.  Tr. 61-62.  She reported being clean from cocaine for almost three years and she last had a drink of alcohol about a year prior on her brother's birthday when he was home from North Carolina.  Tr. 62.

---

[17] On occasion, her mom may need to help her out of the bath.  Tr. 58.

## 2.    Vocational Expert's testimony

Vocational Expert ("VE") Mary Beth Kopar testified at the hearing.  Tr. 68-74, 161-162.
The VE summarized Hahn's past relevant work as including an officer manager job, which is a
skilled, sedentary job,[18] and a parking lot supervisor job, which is a semi-skilled, light job.  Tr.
69.

For her first hypothetical, the ALJ asked the VE to assume an individual of Hahn's age
and education with the same past work experience as described by the VE who is limited as
follows: the individual can occasionally lift and/or carry, including upward pulling 20 pounds;
frequently lift and/or carry, including upward pulling 10 pounds; stand or walk with normal
breaks at least 2 hours in an 8-hour workday; occasionally needs a handheld assistive device for
ambulation and standing; sit with normal breaks for about 6 hours in an 8-hour workday; push
and pull limited to occasionally with lower extremities; occasionally climb ramps, stairs;
occasionally balance, stoop, kneel, crouch, crawl; never climb ladders, ropes, and scaffolds;
avoid all exposure to hazards such as machinery and heights; and no high-production demands
and no rapidly changing work routine.   Tr. 69-71.  The VE indicated that the described
individual would be unable to perform Hahn's past work.  Tr. 71.  However, the VE indicated
that there would be unskilled jobs in the regional or national economy that the described
individual could perform, including (1) ticket seller, an unskilled, light exertion job with over
200,000 positions in the national economy and less than 1,000 in the region; (2) order clerk, an
unskilled, sedentary exertion job with over 300,000 positions in the national economy and
13,000 regionally; and (3) surveillance system monitor, an unskilled, sedentary exertion job with

---

[18] The VE indicated that Hahn performed the office manager job at the light exertional level.  Tr. 69.

over 100,000 positions in the national economy and 500 regionally.  Tr. 71-72.  With respect to the ticket seller position, the VE indicated that she reduced the ticket seller numbers to account for the fact that the hypothetical lifting restrictions were light level and the sitting/standing restrictions were more like sedentary level.  Tr. 71-73.  She based the available ticket seller jobs on those that involved telephonic sales only to allow for a sit-stand option.  Tr. 71-73.

For her second hypothetical, the ALJ asked the VE to add to the first hypothetical a limitation of missing more than 4 days per month due to the combined effects of impairments. Tr. 73.  The VE indicated that, with that additional limitation, there would be no work available for the described individual.  Tr. 73.

For her third hypothetical, the ALJ asked the VE to add to the first hypothetical a limitation requiring the individual to elevate her leg above heart level for a portion of the day while sitting.  Tr. 73.  The VE indicated that, with that additional limitation, there would be no work available for the described individual.  Tr. 73.

In response to Hahn's counsel's inquiry, the VE indicated that, if the first hypothetical was altered to include a limitation of sitting for 4 hours and walking/standing for 2 hours with the need for 10-15 minute breaks every hour, there would be no work available for the described individual.  Tr. 73-74.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

[A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[19] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[20] the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

---

[19] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

[20] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

20 C.F.R. §§ 404.1520, 416.920;[21] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In her May 11, 2012, decision, the ALJ made the following findings:[22]

1. Hahn met the insured status requirements through December 31, 2007. Tr. 18.

2. Hahn had not engaged in substantial gainful activity since December 31, 2002, the alleged onset date. Tr. 18.

3. Prior to Hahn's date last insured of December 31, 2007, there was insufficient evidence to find that Hahn had a severe medically determinable impairment. Tr. 18-19. Thus, there was no merit to Hahn's DIB claim which was based on the period of December 31, 2002, through her date last insured, December 31, 2007.[23] Tr. 19.

4. Hahn had the following severe impairments: history of seizures; coronary artery disease ("CAD") and status post ("s/p") May 2008 myocardial infarction ("MI"); osteoarthritis in the bilateral ankles and feet, more severe in the right foot s/p April 28, 2011, surgical arthrodesis and two subsequent corrective procedures; obesity; mood disorder, not otherwise specified ("NOS"); anxiety disorder, NOS; and cocaine dependence in self-reported remission. Tr. 19-20. Hahn had the following non-severe impairments: carpal tunnel syndrome, hypertension and high cholesterol, "low thyroid," bronchitis, scoliosis, gastroesophageal reflux disease, and hypothyroidism. Tr. 19-20.

---

[21] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

[22] The ALJ's findings are summarized.

[23] Hahn agrees that, because of a lack of medical records, her DIB application is not at issue in this case. Doc. 16, p. 2.

5.    Hahn did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  Tr. 20-23.

6.    Hahn had the RFC to perform light work – which included the exertional abilities to lift and/or carry (including upward pulling) up to 20 pounds occasionally and up to 10 pounds frequently and to sit (with normal breaks) for about 6 hours in an 8-hour workday – except that she is further limited as follows: exertionally, could stand and/or walk (with normal breaks) for at least 2 hours of an 8-hour workday, requires the occasional use of a hand-held assistive device for both station and ambulation, and could occasionally push and/or pull with her bilateral lower extremities as in the operation of foot controls; could occasionally climb ramps and stairs, but never ladders, ropes, or scaffolds; could only occasionally balance, stoop, kneel, crouch, or crawl; must avoid all exposure to hazards in the workplace such as dangerous machinery and heights; and must have no high production demands or rapidly changing work routine. Tr. 23-31.

7.    Hahn is unable to perform any past relevant work.  Tr. 31.

8.    Hahn was born in 1966 and was 36 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 32.

9.    Hahn had at least a high school education and was able to communicate in English.  Tr. 32.

10.   Transferability of job skills was not material to the determination of disability.  Tr. 32.

11.   Considering Hahn's age, education, work experience, and RFC, there were other jobs that existed in significant numbers in the national economy that Hahn could perform, including ticket seller, order clerk, and surveillance-system monitor.  Tr. 32-33.

Based on the foregoing, the ALJ determined that Hahn had not been under a disability from December 31, 2002, through the date of the decision.  Tr. 33.

## V. Parties' Arguments

## A.    Plaintiff's arguments

First, Hahn argues that the ALJ did not have valid reasons for discounting the opinions of her treating psychiatrist, Dr. B. Verma, M.D., and treating psychologist, Dr. Nancy Jones Keogh, Ph.D.  Doc. 16, pp. 9-11, Doc. 19, pp. 1-2.

Second, Hahn argues that the ALJ erred with respect to her assessment of Hahn's credibility.  Doc. 16, pp. 11-12, Doc. 19, pp. 2-3, 4.

Third, Hahn argues that the Commissioner did not satisfy her burden at Step Five because the ALJ failed to present a hypothetical question to the VE that accurately portrayed her limitations.  Doc. 16, pp. 12-14, Doc. 19, pp. 3-4.  Hahn contends that the hypothetical question was inconsistent because it consisted of a light work lifting restriction but limited the hypothetical individual to less than light work, i.e., sedentary work, based on the standing/walking limitation of 2 hours.  Doc. 16, pp. 13-14, Doc. 19, pp. 3-4.  Thus, she asserts that remand is warranted for clarification of what exertional level Hahn is truly limited to.  Doc. 19, pp. 3-4.  Hahn also argues that the ALJ should have relied upon the VE's response to the hypothetical question that included a limitation for missing more than 4 days of work per month because all three of her treating physicians, Dr. Junko, Dr. Keogh and Dr. Verma, said that Hahn would miss four days of work per month.  Doc. 16, pp. 13-14, Doc. 19, pp. 3-4.

## B.    Defendant's arguments

In response, the Commissioner first argues that substantial evidence supports the ALJ's decision to provide little weight to the opinions of Hahn's treating psychiatrist and treating psychologist and the ALJ properly explained her decision.  Doc. 18, pp. 13-15.

Second, the Commissioner argues that the ALJ properly evaluated Hahn's credibility and the ALJ's determination that Hahn's statements regarding the intensity, persistence and limiting

effects of her symptoms were not credible to the extent inconsistent with the RFC was supported by substantial evidence.  Doc. 18, pp. 15-18.

Third, the Commissioner argues that the fact that the ALJ referenced light work but limited Hahn to 2 hours of walking/standing is not a basis for reversal because the hypothetical question accurately portrayed the limitations as found by the ALJ.  Doc. 18, pp. 18-19.  Further, the Commissioner argues that the ALJ did not err by not relying on the VE's response to the hypothetical question that included a limitation of missing more than 4 days per month because the ALJ explained the weight provided to the opinion evidence and the ALJ's decision with respect to those opinions was supported by substantial evidence.  Doc. 18, pp. 18-20.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v.*

*Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**A.      The ALJ properly considered the opinions of Hahn's treating psychologist and psychiatrist**

Hahn argues that the ALJ did not provide valid reasons for discounting the opinions of Dr. Verma, her treating psychiatrist, and Dr. Keogh, her treating psychologist.  Doc. 16, pp. 9-11, Doc. 19, pp. 1-2.

Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)) (internal quotations omitted).  If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *Wilson*, 378 F.3d at 544.  In deciding the weight given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion.  *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c).  However, while an ALJ"s decision must include "good reasons" for the weight provided, the ALJ is not obliged to provide "an exhaustive factor-by-factor analysis."  *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).

As discussed below, in accordance with the treating physician rule, the ALJ assigned weight to the opinions of Drs. Verma and Keogh and provided good reasons for the weight assigned. Here the ALJ thoroughly discussed Hahn's mental health treatment. Tr.28- 29. The ALJ considered Dr. Verma's 2010 opinion, Dr. Keogh's 2010 opinion, and Dr. Keogh's 2011 opinion. Tr. 30 (referencing Exhibit 2F, Tr. 352 (Dr. Verma 2010 opinion); Exhibit 3F, Tr. 353 (Dr. Keogh's 2010 opinion); Exhibits 22F, Tr. 603-610, and 27F, Tr. 711-717, (Dr. Keogh's January 31, 2011, opinion).[24] Further, when the ALJ assigned weight to those opinions, she explained the weight assigned, stating:

> Contrastingly,[25] little weight was assigned to the opinions of the claimant's treating psychiatrists, Dr. Verma (Ex. 2F) and Dr. Keogh (Ex. 3F, 22F, 27F). In a May 10, 2010 statement, Dr. Verma expressed that the claimant's symptoms of mixed-type bipolar disorder "can exacerbate physical and psychological pain, suffering, insomnia, etc." as support for his opinion that she had "marked" degree of restriction in social functioning and daily activities and would be expected to miss more than four days of work each month. A contemporaneous statement from Dr. Keogh opined as the same frequency of absences and marked degree of limitations, also in the areas of concentration, persistence or pace (Ex. 3F). In a January 31, 2011 updated medical source statement, Dr. Keogh listed her belief as to "no useful ability to function" in dealing with normal work stressors or sustaining an ordinary routine, "extreme" limitations in all the "paragraph B" criteria, three episodes of decompensation each lasting for two weeks, and inability to function outside a highly supportive living arrangement (Ex. 22F, 27F). She affirmed her opinion that the claimant would be absent from work more than four days in a given month as a result of her bipolar disorder.

> The degree of limitation expressed in these statements from the treating psychiatrists is largely unsupported by, if not contradictory to, the treatment notes from Community Health Center as well as the claimant's subjective reports of limitation. Dr. Keogh's explanation that bipolar disorder can "make it difficult to concentrate or to remember detailed instructions, set goals, and are quite

---

[24] As previously noted, Dr. Keogh's January 31, 2011, opinion appears in the record twice.

[25] The ALJ was contrasting her prior discussion regarding the consultative and reviewing physicians' opinions. Tr. 30. The ALJ gave significant but less than full weight to the opinion of the consultative examining psychologist Dr. Dallara and greater weight to the opinion of the state agency reviewing psychologists. Tr. 30. Dr. Dallara found Hahn's ability to tolerate stress and pressure mildly impaired. Tr. 517. In contrast, the state agency reviewing psychologists found that Hahn's ability to tolerate stressors was moderately, rather than mildly, impaired. Tr. 528, 579. The ALJ gave greater weight to the state agency reviewing psychologist as to that issue because she found moderate limitations more consistent with Hahn's treatment history. Tr. 30.

stressful" [*sic*] may be true as a general matter but hardly survives scrutiny when considering the clinical observations as to improving concentration and attention span as noted in the medical-somatic progress notes.  The GAF ratings with the "serious" range at 40-45 opined by Dr. Verma and Keogh in May 2010 are not substantiated in the treatment notes beyond initial psychiatric evaluation on August 26, 2009 – notably, when she had been abstinent from cocaine for just one week – with scores are almost always within the "moderate" range of 51-60, if not above that level (Ex. 7F/68-71; *see* Ex. 7F/9 [GAF 50 on admission improves to 70 on discharge from dual-diagnosis treatment; Ex. 25F/2, 5-9, 12, 15, 26, 24, 28, 30, 33, 35, 37 [GAFs assigned by psychologist/counselor between 53 and 58; *cf.* Ex. 25F/20 [one "serious" GAF rating of 49 in June 2011]).  Dr. Keogh also assigned in January 2011 a "moderate" GAF rating of 55 (highest of 65), which is concordant with the progress notes but certainly not with the extent of limitation she opined at that time (Ex. 22F).  In sum, the various opinions of the claimant's treating psychiatrist have been given little weight as lacking in support from the evidence.

Tr. 30-31.

Contrary to Hahn's claim, the ALJ provided detailed support for the weight provided to the opinions Drs. Verma and Keogh and Hahn has failed to argue or demonstrate that those reasons are unsupported by the record.

As discussed and explained by the ALJ, Drs. Verma and Keogh's marked or extreme limitations are in contrast to treatment notes reflective of an individual with moderate symptoms. Tr. 30.  The ALJ correctly noted that Hahn's GAF scores were, with one or two exceptions, consistently within the moderate range.  Tr. 643, 646, 648, 650, 653, 656, 658, 660, 665, 667, 669, 671, 674, 676, 678 (generally reflecting GAF scores in the mid-50 range); *See* "DSM-IV-TR", at 34 (A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.).  Further, although Dr. Keogh rated Hahn as having a GAF score of 40 in May 2010 (Tr. 353), in her January 2011 opinion, Dr. Keogh rated Hahn as having a GAF score of 55 (with Hahn's highest GAF score in the past year noted as being 65).  Tr. 711.

The ALJ also correctly noted that Hahn's mental health treatment notes and mental status findings generally reflected overall improvement in depression with mildly impaired but improving attention and concentration as well as symptoms being generally well controlled with medication.  Tr. 29, 30.  Hahn has not even attempted to demonstrate that the ALJ's findings in this regard are not supported by the record.  Rather, she argues that the ALJ improperly "played doctor."  Doc. 16, p. 10, Doc. 19, p. 2.  However, a review of Hahn's treatment records demonstrates that the ALJ's findings are supported by the record.  For example, Hahn's May 24, 2010, treatment notes reflect that Hahn was "alert and coherent."  Tr.  468.  She denied mood swings, racing thoughts, or panic attacks.  Tr. 468.  She was not too depressed or anxious.  Tr. 468.  She was friendly and showing improvement in concentration, attention span, and coping skills.  Tr. 468.  Similar mental status findings are documented throughout Hahn's treatment records.  *See e.g.* Tr. 458, 460, 462, 464, 466, 468, 470, 472, 474, 476, 478, 480, 482, 485, 487, 489, 491, 495, 680, 684, 686, 688, 690, 692, 694, 696, 699, 701, 703, 705, 707.  Additionally, the ALJ considered treatment notes reflecting, among other activities, Hahn's interest in trying to get her driver's license back, the possibility of pursuing a part-time job or volunteer work, and taking a trip to Myrtle Beach.  Tr. 29, 648, 652.

Hahn also summarily argues that the ALJ improperly relied upon opinions from a one-time examining psychologist and reviewing psychologists who reviewed some of the evidence but never saw Hahn.  Doc. 16, pp. 10-11, Doc. 19, p. 2.  However, an ALJ may rely on evidence other than treating source opinions.  *See* 20 C.F.R. § 404.1527.  Further, Hahn has not even attempted to demonstrate that the ALJ failed to explain the weight she assigned to those opinions or that the ALJ's assignment of weight to those opinions was unsupported by the evidence.

For the reasons set forth above, the Court finds that the ALJ's discussion of the evidence and explanation of the weight provided to the opinions of Drs. Verma and Keogh makes sufficiently clear the weight given to the treating physician's opinion and the reasons for that weight, *Wilson*, 378 F.3d at 544, and those reasons are supported by substantial evidence.[26] Accordingly, the Court finds no violation of the treating physician rule.

**B.     The ALJ properly evaluated Hahn's credibility**

Hahn argues that the ALJ's credibility analysis was faulty because she failed to provide specific reasons supported by the record for discrediting her allegations. Doc. 16, pp. 11-12, Doc. 19, pp. 2-3.

Social Security Ruling 96–7p and 20 C.F.R. § 404.1529 describe a two-part process for assessing the credibility of an individual's subjective statements about his or her symptoms. First, the ALJ must determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged; then the ALJ must evaluate the intensity and persistence associated with those symptoms to determine how those symptoms limit a claimant's ability to work.

When evaluating the intensity and persistence of a claimant's symptoms, consideration is given to objective medical evidence and other evidence, including: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) other

---

[26] While an ALJ's decision must include "good reasons" for the weight provided, the ALJ is not obliged to provide "an exhaustive factor-by-factor analysis." *See Francis v. Comm'r of Soc. Sec*., 414 Fed. Appx. 802, 804 (6th Cir. 2011). Thus, to the extent that the ALJ did not specifically discuss each and every factor in 20 C.F.R. 404.1527(c), reversal and remand is not required.

factors concerning functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. § 404.1529(c); Soc. Sec. Rul. 96–7p, 1996 WL 374186, at 3 (July 2, 1996).  "An ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.  Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence."  *Calvin v. Comm'r of Soc. Sec.*, 437 F. Appx. 370, 371 (6th Cir. 2011) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir.1997)).

The ALJ considered Hahn's allegations regarding the severity of her symptoms (Tr.  23-24 (discussing Hahn's written statements, statements made during the reconsideration phase, and statements made during the hearing concerning her allegations regarding the severity of her impairments)) and discussed in detail Hahn's treatment history for both her physical and mental impairments (Tr. 24-26, 28-29).  She concluded that "[t]he alleged severity of the claimant's symptoms and the effect on her functioning is not proportionate to the total medical and non-medical evidence of record."  Tr. 26.

In reaching this conclusion, the ALJ considered among other evidence Dr. Ilodi's consultative examination findings and his conclusion that Hahn retained the ability to stand/walk for one to two consecutive hours which was in contrast to Hahn's claim that she could stand/walk for only 5-10 minutes.  Tr. 26, 508.  The ALJ also considered post-operative findings by Dr. Junko that Hahn appeared to be doing well, had very limited swelling, only slightly decreased sensation over the right dorsum, and her pain was well controlled with medication.  Tr. 26, 612-613.

The ALJ considered statements relayed by Hahn during her mental health treatment sessions regarding her pain, noting that, during an August 8, 2011, session, Hahn indicated that

she was using pain medication sparingly. Tr. 26, 652. Instead, Hahn was using ice packs, ibuprofen and elevation. Tr. 652. The ALJ acknowledged that Hahn had had complications from her foot surgeries but, based on her presentation at the hearing without an assistive device, noted that Hahn appeared to have recovered from her surgeries. Tr. 26. The ALJ considered Hahn's own testimony regarding the frequency with which she needs to elevate her leg above heart level, noting that Hahn indicated that she does not need to elevate her leg on a daily basis. Tr. 26, 62-63. Rather, she indicated that her need to elevate her leg was related to her level of activity or the extent of swelling. Tr. 26, 62-63. In addition to considering that Hahn did not appear at the hearing with a cane, the ALJ also considered Hahn's testimony that she did not always need to use a cane but rather used a cane on an as needed basis.[27] Tr. 26-27, 66-67.

The ALJ considered evidence of Hahn's noncompliance with her physicians' treatment recommendations to quit smoking. Tr. 26, 413, 635-636. Also, in discussing the medical evidence, the ALJ noted that, while there was some documentation regarding drowsiness as a side effect of medication, Hahn's allegation that she could not get out of bed approximately 20 days out of a month was not credible when considering the medical records and her overall response to treatment. Tr. 29.

Although Hahn disagrees with the ALJ's credibility assessment, the ALJ's analysis was not limited to a single piece of evidence and is sufficiently clear to allow this Court to determine whether the ALJ conducted a proper credibility assessment and whether that determination is supported by substantial evidence. Soc. Sec. Rul. 96–7p, 1996 WL 374186, at 4. In reviewing

---

[27] As part of her credibility argument, Hahn suggests that the ALJ improperly discounted the opinion of Dr. Ilodi. Doc. 16, p. 12. However, she does not separately raise an argument with respect to the weight assigned to Dr. Ilodi's opinion and "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) (internal citations omitted). Therefore, any argument regarding the weight assigned to Dr. Ilodi's opinion is waived.

an ALJ's credibility determination, a court is "limited to evaluating whether or not the ALJ's explanations for partially discrediting [claimant's testimony] are reasonable and supported by substantial evidence in the record." *Jones v. Comm'r of Soc. Sec*., 336 F.3d 469, 476 (6th Cir. 2003).  The court may not "try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility."  *Gaffney v. Bowen*, 825 F.2d 98, 100 (6th Cir. 1987).

Having reviewed the ALJ's decision, and considering that an ALJ's credibility assessment is to be accorded great weight and deference, the undersigned finds that the ALJ's credibility analysis regarding the severity of Hahn's impairments is supported by substantial evidence.  Accordingly, Hahn's request to reverse and remand the Commissioner's decision on the basis of the ALJ's credibility assessment is without merit.

## C.  The ALJ's Step Five finding is supported by substantial evidence

Hahn argues that the ALJ did not meet her burden at Step Five because she relied upon a hypothetical question that did not accurately portray her treating sources' opinions that she would miss a lot of work.  Doc. 16, pp. 12-14.  She also argues that the ALJ's RFC and VE hypothetical are flawed because the ALJ made a finding that Hahn could perform light work but included standing/walking and sitting limitations that were more consistent with sedentary work.  Doc. 16, p. 13, Doc. 19, pp. 3-4.  She contends that remand and reversal is necessary in order to clarify what exertional level she is truly limited to.  Doc. 19, p. 4.

The Regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant evidence" of record.  20 C.F.R. § 404.1545(a); 20 C.F.R. § 404.1546(c).  "In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence . . . the question must accurately portray a claimant's physical and mental impairments.  The hypothetical

questions, however, need only incorporate those limitations which the ALJ has accepted as credible." *Parks v. Social Sec. Admin.*, 413 Fed. Appx. 856, 865 (6th Cir. 2011) (citing *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010) and *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).

With respect to Hahn's claim that the VE hypothetical did not accurately portray the limitation of missing more than four days of work per month as contained in Drs. Verma, Keogh, and Junko's opinions or the limitation of being unable to work for at least a year as contained in Dr. Junko's opinion (Doc. 16, p. 14), Hahn fails to demonstrate error. With respect to the opinions of Drs. Verma and Keogh, as noted above, the ALJ properly considered those opinions and gave them little weight. Therefore, the ALJ's lack of inclusion of a limitation for missing more than four days of work per month in the hypothetical question presented to the VE and relied upon by the ALJ was not error. With respect to the opinions of Dr. Junko regarding Hahn's absences from work and/or inability to work for at least one year, the ALJ gave less than controlling or no weight to those opinions (Tr. 28) and Hahn has failed to challenge that weight or argue how the ALJ's decision with respect to Dr. Junko is not supported by the record. Accordingly, the ALJ's lack of inclusion of a limitation for missing work based on Dr. Junko's opinions in the hypothetical question presented to the VE and relied upon by the ALJ was not error.

With respect to Hahn's claim that the VE hypothetical was faulty because the ALJ's RFC finding indicates that Hahn is capable of light work even though the RFC contains limitations more consistent with sedentary work, Hahn's argument is unpersuasive. The RFC and VE hypothetical both contained components of light exertional work,[28] i.e., the lifting restrictions,

---

[28] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires

and sedentary exertional work,[29] i.e., the standing/walking and sitting restrictions.  Hahn has failed to demonstrate that the VE hypothetical question upon which the ALJ relied did not accurately portray the limitations as found by the ALJ and reflected in the RFC.  Although the ALJ initially described the RFC in terms of light exertional work, the ALJ clearly identified exceptions, including with respect to her standing/walking limitations. Tr. 23.  Additionally, with respect to the one identified light exertional job, i.e., ticket seller, the VE reduced the number of available jobs to account for the fact that the hypothetical individual had limitations reflective of a combination of both light and sedentary work.  Tr. 71-73.  The other two identified jobs were sedentary level jobs.  Tr. 72.

Since, as discussed above, the VE testimony upon which the ALJ relied was provided in response to a hypothetical question that accurately portrayed the limitations accepted by the ALJ as credible and contained in the RFC, the ALJ's reliance upon the VE testimony was proper and constitutes substantial evidence.  *See Parks,* 413 Fed. Appx. at  865.  Accordingly, the Court finds that Hahn's request for reversal and remand based on her claim that the VE hypothetical question did not accurately portray her limitations is without merit.

---

a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  20 C.F.R. § 404.1567(b).

[29] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. 404.1567(a).

### VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.

January 20, 2015

Kathleen B. Burke
United States Magistrate Judge